**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARACELI RODRIGUEZ, individually and as the surviving mother and personal representative of J.A., *Plaintiff-Appellee*, <br><br> v. <br><br> LONNIE SWARTZ, Agent of the U.S. Border Patrol, *Defendant-Appellant.* | No. 15-16410 <br><br> D.C. No. 4:14-cv-02251-RCC <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, Chief Judge, Presiding

Argued and Submitted October 21, 2016
Submission Withdrawn October 21, 2016[*]
Resubmitted July 31, 2018
San Francisco, California

Filed August 7, 2018

---

[*] We withdrew this case from submission pending the Supreme Court's decision in *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (per curiam), and supplemental briefing on the effect of that decision.

Before:  Andrew J. Kleinfeld and Milan D. Smith, Jr.,
Circuit Judges, and Edward R. Korman,[**] District Judge.

Opinion by Judge Kleinfeld;
Dissent by Judge Milan D. Smith, Jr.

## SUMMARY[***]

### Civil Rights

The panel affirmed the district court's order denying qualified immunity to a United States Border Patrol agent who, while standing on American soil, shot and killed J.A., a teenage Mexican citizen who was walking down a street in Mexico.

The panel held that assuming, as it was required to do, that the facts as pleaded in the First Amended Complaint were true, the agent was not entitled to qualified immunity. The panel held that J.A. had a Fourth Amendment right to be free from the unreasonable use of deadly force by an American agent acting on American soil, even though the agent's bullets hit him in Mexico. The panel further held that given the circumstances, that J.A. was not suspected of any crime, was not fleeing or resisting arrest and did not pose a threat to anyone, the use of force was unreasonable under the

---

[**] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Fourth Amendment. The panel concluded that no reasonable officer could have thought that he could shoot J.A. dead if, as pleaded, J.A. was innocently walking down a street in Mexico.

The panel held that pursuant to the Supreme Court's decision in *Hernandez v. Mesa*, 137 S. Ct. 137 2003 (2017), it had jurisdiction, on interlocutory appeal, to decide whether J.A.'s mother had a cause of action for damages against the agent pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 389 (1971). The panel held that despite its reluctance to extend *Bivens*, it would do so here because no other adequate remedy was available, there was no reason to infer that Congress deliberately chose to withhold a remedy, and the asserted special factors either did not apply or counseled in favor of extending *Bivens*.

Dissenting, Judge M. Smith stated that the panel lacked the authority to extend *Bivens* to the cross-border context presented in this case. In holding to the contrary, Judge M. Smith believed that the majority created a circuit split, overstepped separation-of-powers principles, and disregarded Supreme Court law.

## COUNSEL

Sean Christopher Chapman (argued), Law Offices of Sean C. Chapman P.C., Tucson, Arizona, for Defendant-Appellant.

Lee Glernt (argued) and Andre Segura, Immigrants' Rights Project, American Civil Liberties Union Foundation, New York, New York; Luis F. Parra, Parra Law Offices, Nogales, Arizona; Cecilia Wang and Cody Wofsy, Immigrants' Rights Project, American Civil Liberties Union Foundation, San Francisco, California; Daniel J. Pochoda and James Duff Lyall, ACLU Foundation of Arizona, Phoenix, Arizona; Robert C. Montiel, Roberto Montiel Law Offices, Nogales, Arizona; Mitra Ebadolahi, ACLU Foundation of San Diego and Imperial Counties, San Diego, California; Arturo J. Gonzalez and Hector Suarez, Morrison & Foerster LLP, San Francisco, California; Marc A. Hearron, Morrison & Foerster LLP, Washington, D.C.; for Plaintiff-Appellee.

Henry Whitaker (argued), Mark B. Stern, and Katherine Twomey Allen, Appellate Staff; Chad A. Readler, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States.

Jeffrey L. Bleich, Dentons US LLP, San Francisco, California; Andrew Cath Rubenstein and Nicholas D. Fram, Munger Tolles & Olson LLP, San Francisco, California; for Amici Curiae Professors of Constitutional Law and Foreign Relations Law.

Sarah P. Alexander and Mary Inman, Constantine Cannon LLP, San Francisco, California, for Amicus Curiae Human Rights Watch.

Donald Francis Donovan, Carl J. Micarelli, Brandon Burkart, and Aymeric Damien Dumoulin, Debevoise & Plimpton LLP, New York, New York, for Amicus Curiae Government of the United Mexican States.

Matthew E. Price and William K. Dreher, Jenner & Block LLP, Washington, D.C., for Amici Curiae Law Professors.

Stanley Young, Covington & Burling LLP, Redwood Shores, California, for Amicus Curiae Coalición de Derechos Humanos, The Southern Border Communities Coalition, No More Deaths, The National Immigration Project of the National Lawyers Guild, The Kino Border Initiative, and the American Immigration Council.

Ethan D. Dettmer, Joshua S. Lipshutz, Eli M. Lazarus, Katherine C. Warren, and Courtney J. Chin, Gibson Dunn & Crutcher LLP, San Francisco, California, for Amici Curiae Scholars of U.S.-Mexico Border Issues.

Mahesha P. Subbaraman, Subbaraman PLLC, Minneapolis, Minnesota; Vivek Krishnamurthy, Christopher T. Bavitz, and Andrew F. Sellars, Cyberlaw Clinic, Harvard Law School, Cambridge, Massachusetts, for Amicus Curiae Restore the Fourth Inc.

## OPINION

KLEINFELD, Senior Circuit Judge:

A U.S. Border Patrol agent standing on American soil shot and killed a teenage Mexican citizen who was walking down a street in Mexico. We address whether that agent has

qualified immunity and whether he can be sued for violating the Fourth Amendment. Based on the facts alleged in the complaint, we hold that the agent violated a clearly established constitutional right and is thus not immune from suit. We also hold that the mother of the boy who was killed has a cause of action against the agent for money damages.

## FACTS

We take the facts as they are pleaded in the First Amended Complaint. These facts have not been proven, and they may not be true. But we must assume that they are true for the sake of determining whether the case may proceed.[1]

Shortly before midnight on October 10, 2012, defendant Lonnie Swartz was on duty as a U.S. Border Patrol agent on the American side of our border with Mexico. J.A., a sixteen-year-old boy, was peacefully walking down the Calle Internacional, a street in Nogales, Mexico, that runs parallel to the border. Without warning or provocation, Swartz shot J.A. dead. Swartz fired somewhere between 14 and 30 bullets across the border at J.A., and he hit the boy, mostly in the back, with about 10 bullets. J.A. was not committing a crime. He did not throw rocks or engage in any violence or threatening behavior against anyone or anything. And he did not otherwise pose a threat to Swartz or anyone else. He was just walking down a street in Mexico.

The Calle Internacional, where J.A. was walking, is a main thoroughfare lined with commercial and residential buildings. The American side of the border is on high ground, atop a cliff or rock wall that rises from the level of

---

[1] *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).

the Calle Internacional. The ground on the American side is around 25 feet higher than the road, and a border fence rises another 20 or 25 feet above that. (See the Appendix for a photograph.) The fence is made of steel beams, each about 6½ inches in diameter, set about 3½ inches apart. Nogales, Mexico, and Nogales, Arizona, are in some respects one town divided by the border fence. Families live on both sides of the border, and people go from one side to the other to visit and shop. J.A.'s grandparents live in Arizona. They were lawful permanent residents at the time of the shooting, and they are now U.S. citizens. J.A.'s grandmother often stayed with him in Mexico when his mother was away at work. J.A. was a Mexican citizen who had never been to the United States, but Swartz did not know that when he shot J.A.

J.A.'s mother, Araceli Rodriguez, acting both individually and as a personal representative of J.A.'s estate, sued Lonnie Swartz for money damages. She has two claims: one for a violation of her son's Fourth Amendment rights, and another for a violation of his Fifth Amendment rights. Her complaint alleges no facts that could allow anyone to characterize the shooting as being negligent or justifiable. What is pleaded is simple and straightforward murder.

To summarize the facts alleged in the complaint: Swartz was an on-duty U.S. Border Patrol agent stationed on the American side of the border fence. J.A. was a Mexican citizen walking down a street in Mexico. Swartz fired his pistol through the border fence into Mexico. He intentionally killed J.A. without any justification. Swartz acted entirely from within the United States, but J.A. was in Mexico when Swartz's bullets struck and killed him. Swartz did not know J.A.'s citizenship or whether he had substantial connections

to the United States, so for all Swartz knew, J.A. could have been an American citizen.

Swartz moved to dismiss the complaint based on qualified immunity.  He conceded that Rodriguez had a *Bivens* cause of action under the Fourth Amendment.  In a carefully reasoned opinion, the district court held that Swartz was not entitled to qualified immunity on the Fourth Amendment claim.  Because it treated the shooting as a "seizure" under the Fourth Amendment, the court dismissed the Fifth Amendment claim.[2]

Swartz filed this interlocutory appeal to challenge the district court's denial of qualified immunity.  The United States filed an amicus brief that presented an argument that had not been made in district court: that Rodriguez lacks a *Bivens* cause of action for a Fourth Amendment violation.  Though Swartz had not raised that argument in his opening brief on appeal, he adopted it in his reply brief.

We affirm the district court's decision to let Rodriguez's Fourth Amendment claim proceed.

## ANALYSIS

### I.  QUALIFIED IMMUNITY

Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which

---

[2] *Rodriguez v. Swartz*, 111 F. Supp. 3d 1025, 1033–41 (D. Ariz. 2015).

a reasonable person would have known."**³**  "To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident."**⁴**  A constitutional right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right."**⁵**

Based on the facts alleged in the complaint, Swartz violated the Fourth Amendment.  It is inconceivable that any reasonable officer could have thought that he or she could kill J.A. for no reason.  Thus, Swartz lacks qualified immunity.

## A. The Fourth Amendment forbids using unreasonable force to "seize" a person.

The Fourth Amendment prohibits law enforcement officers from using "objectively unreasonable" force to "seize" a person.**⁶**  In *Harris v. Roderick*, a person shot by a federal agent brought a *Bivens* claim for a Fourth Amendment violation.**⁷**  We held that the officer lacked qualified

---

**³** *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

**⁴** *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc).

**⁵** *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation, brackets, and internal quotation marks omitted).

**⁶** *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

**⁷** 126 F.3d 1189, 1194 (9th Cir. 1997).

immunity.**8**   Following the Supreme Court's decision in *Graham v. Connor*, we wrote that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."**9**   "Ordinarily," we continued, "our inquiry is . . . whether the totality of circumstances, (taking into consideration the facts and circumstances of the particular case including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade by flight) justified the particular type of seizure."**10**   Then, quoting the Supreme Court's decision in *Tennessee v. Garner*, we wrote that even when a felony suspect tries to escape, "where the suspect poses no immediate threat to the officer and no threat to others, the harm from failing to apprehend him does not justify the use of deadly force to do so."**11**

These principles are clearly established.**12**   As we held in *Harris*, every reasonable law enforcement officer should know that "officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the

---

**8** *Id.* at 1205.

**9** *Id.* at 1201 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks and brackets omitted).

**10** *Id.* (quoting *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)) (internal quotation marks omitted).

**11** *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)) (capitalization altered).

**12** *See, e.g.*, *Adams v. Speers*, 473 F.3d 989, 993–94 (9th Cir. 2007).

officer or others, or is fleeing and his escape will result in a serious threat of injury to persons."[13] And "whenever practicable, a warning must be given before deadly force is employed."[14]

## B. The Fourth Amendment applies here.

Even though we must assume that Swartz shot and killed J.A. for no reason, Swartz nevertheless argues that he did not violate the Constitution. He relies on *United States v. Verdugo-Urquidez*, which held that the Fourth Amendment did not apply to the search and seizure of a non-citizen's property that was located abroad.[15] J.A. was a Mexican citizen who was shot, and therefore "seized," in Mexico.[16] We must therefore determine whether the Fourth Amendment applies in this case.

*Boumediene v. Bush* establishes that to determine whether the Constitution applies here, we must examine J.A.'s citizenship and status, the location where the shooting occurred, and any practical concerns that arise.[17] Neither

---

[13] *Harris*, 126 F.3d at 1201 (citing *Curnow*, 952 F.2d at 325; *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991)).

[14] *Id.* (citing *Garner*, 471 U.S. at 11–12).

[15] 494 U.S. 259, 274–75 (1990).

[16] *See Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989).

[17] 553 U.S. 723, 766 (2008). Though *Boumediene* limited its holding to the Suspension Clause, *Hamad v. Gates*, 732 F.3d 990, 1005 (9th Cir. 2013), its reasoning still applies here, *see Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 997 (9th Cir. 2012) (considering *Boumediene* in a Fifth Amendment case).

citizenship nor voluntary submission to American law is a prerequisite for constitutional rights.[18]  Instead, citizenship is just one of several non-dispositive factors to consider.[19]

In *Boumediene*, the Supreme Court held that enemy combatants detained at the U.S. Naval Station at Guantanamo Bay, Cuba, were entitled to the writ of habeas corpus.[20] Geography was an important factor in *Boumediene*. Guantanamo Bay is in Cuba, and Cuba has sovereignty over it, but it is the United States that has complete practical control over Guantanamo.[21]  The geography is different in our case.  Although Swartz was in the United States when he shot at J.A., Mexico has both sovereignty and practical control over the street where J.A. was hit.[22]  Nevertheless, we conclude that J.A. had a Fourth Amendment right to be free from the unreasonable use of such deadly force.

*United States v. Verdugo-Urquidez* held that the Fourth Amendment did not apply to the search and seizure of a

---

[18] *See Boumediene*, 553 U.S. at 766.

[19] *See id.* at 764 (describing a "common thread" in Supreme Court precedent: "the idea that questions of extraterritoriality turn on objective factors and practical concerns, not formalism").

[20] *Id.* at 771.

[21] *Id.* at 753–55, 769–70.

[22] Rodriguez alleges that Border Patrol agents "exert control over the immediate area on the Mexican side [of the border fence], including where J.A. was shot."  Accordingly, she argues that the Fourth Amendment must apply here.  But we need not address that argument; the Constitution applies for other reasons.

Mexican citizen's property in Mexico.**[23]** There, Mexican authorities arrested suspected cartel leader Rene Verdugo-Urquidez in Mexico, brought him to the United States, and handed him over to American law enforcement so that he could be tried in the United States. Later, American and Mexican agents searched Verdugo-Urquidez's house in Mexico without a warrant. During the search, agents seized evidence showing that Verdugo-Urquidez was a drug smuggler. Verdugo-Urquidez challenged the search and seizure, but the Supreme Court held that the U.S. Constitution did not apply.**[24]**

According to the *Verdugo-Urquidez* majority opinion, the text of our Fourth Amendment "suggests that 'the people' protected by the Fourth Amendment . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."**[25]** Because Verdugo-Urquidez was a Mexican citizen with no voluntary connection to the United States, he was not among "the people."**[26]** But the Fourth Amendment's text was "by no means conclusive,"**[27]** and the majority also relied on history,

---

**[23]** 494 U.S. 259, 274–75 (1990).

**[24]** *Id.* at 262–63, 275.

**[25]** *Id.* at 265 (quoting U.S. CONST. amend. IV); *see* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

**[26]** *See Verdugo-Urquidez*, 494 U.S. at 265, 271–72.

**[27]** *Id.* at 265.

precedents, and practicalities in holding that the Fourth
Amendment did not apply to the search and seizure of a
nonresident alien's property located abroad.[28]  Among the
Court's practical concerns were that a warrant from an
American magistrate "would be a dead letter outside the
United States" and that requiring warrants for searches abroad
would plunge the executive branch "into a sea of
uncertainty."[29]  Justice Kennedy, concurring, said that he
could not "place any weight on the reference to 'the people'
in the Fourth Amendment."[30]  But he agreed with the majority
that it would be "impractical and anomalous" to apply the
Fourth Amendment warrant requirement to aliens abroad.[31]

But this case is not like *Verdugo-Urquidez* for several
reasons.  For one, *Verdugo-Urquidez* addressed only "the
search and seizure by United States agents of property that
[was] owned by a nonresident alien and located in a foreign
country."[32]  That type of search and seizure implicates
Mexican sovereignty because Mexico is entitled to regulate
conduct in its territory.  But unlike the American agents in
*Verdugo-Urquidez*, who acted on Mexican soil, Swartz acted
on American soil.  Just as Mexican law controls what people

---

[28] *See id.* at 266–75.

[29] *Id.* at 274.

[30] *Id.* at 276 (Kennedy, J., concurring).

[31] *Id.* at 278.

[32] *Id.* at 261 (majority opinion); *see id.* at 274–75.

do there, American law controls what people do here.[33] *Verdugo-Urquidez* simply did not address the conduct of American agents on American soil. Also, the agents in *Verdugo-Urquidez* knew that they were searching a Mexican citizen's property in Mexico, but Swartz could not have known whether J.A. was an American citizen or not.[34]

The practical concerns in *Verdugo-Urquidez* about regulating conduct on Mexican soil also do not apply here. There are many reasons not to extend the Fourth Amendment willy-nilly to actions abroad, as *Verdugo-Urquidez* explains.[35] But those reasons do not apply to Swartz. He acted on American soil subject to American law.

We recognize that on similar facts, the Fifth Circuit reached a contrary conclusion.[36] But its reasoning was about the Fourth Amendment generally, including warrantless searches of those crossing the border and electronic surveillance of the border itself. The concerns in *Verdugo-Urquidez* were also specific to warrants and overseas operations.[37] But this case is not about searches and seizures

---

[33] *See generally* 1 Restatement (Third) of the Foreign Relations Law of the United States §§ 402–03, at 237–54 (Am. Law Inst. 1987).

[34] *Cf. Boumediene v. Bush*, 553 U.S. 723, 766–67 (2008) (treating the detainees' alleged innocence as a reason to apply the Constitution).

[35] *See* 494 U.S. at 273–74; *id.* at 278 (Kennedy, J., concurring).

[36] *See Hernandez v. United States*, 757 F.3d 249, 266–67 (5th Cir. 2014), *vacated in part on reh'g en banc*, 785 F.3d 117 (5th Cir. 2015).

[37] *See* 494 U.S. at 273–74; *see also id.* at 278 (Kennedy, J., concurring).

broadly speaking. Neither is it about warrants or overseas operations. It is about the unreasonable use of deadly force by a federal agent on American soil. Under those limited circumstances, there are no practical obstacles to extending the Fourth Amendment. Applying the Constitution in this case would simply say that American officers must not shoot innocent, non-threatening people for no reason. Enforcing that rule would not unduly restrict what the United States could do either here or abroad. So under the particular circumstances of this case, J.A. had a Fourth Amendment right to be free from the objectively unreasonable use of deadly force by an American agent acting on American soil, even though Swartz's bullets hit him in Mexico. *Verdugo-Urquidez* does not require a different conclusion.

And according to the complaint, Swartz used objectively unreasonable force. To determine whether a particular use of force is objectively unreasonable, we balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[38] "The intrusiveness of a seizure by means of deadly force is unmatched,"[39] so deadly force is unreasonable unless there are strong countervailing government interests. But the government had *no* interest whatsoever in shooting J.A. He was not suspected of any crime. He was not fleeing or resisting arrest. And he did not pose a threat of harm to anyone at all. The use of deadly force was therefore unreasonable under the Fourth Amendment.

---

[38] *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation marks omitted).

[39] *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

## C. It was clearly established that Swartz could not shoot J.A.

Even though Rodriguez has more than sufficiently alleged that Swartz violated the Constitution, that does not automatically mean that Swartz lacks qualified immunity. Instead, Swartz lacks immunity only if J.A.'s Fourth Amendment right was "clearly established" when he was shot and killed.[40]

A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[41]   Although precedent is certainly relevant to determining what a reasonable officer would know, "it is not necessary . . . that the very action in question has previously been held unlawful."[42]   Instead, an officer loses qualified immunity, even in novel situations, if he or she commits a "clear" constitutional violation.[43]   Swartz argues that when he shot

---

[40] Some argue that the "clearly established" prong of the analysis lacks a solid legal foundation. *See generally* William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."). But we must apply it here.

[41] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation, brackets, and internal quotation marks omitted).

[42] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (capitalization altered, citation and internal quotation marks omitted).

[43] *See Hope v. Pelzer*, 536 U.S. 730, 738–39, 741 (2002).

J.A., it was not clearly established that he could not shoot someone on the other side of the border.  We cannot agree.

"The qualified immunity analysis . . . is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question.  Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant."[44] This timing factor usually applies to protect an officer from being judged with 20/20 hindsight.  Such hindsight often fails to take into account what an officer reasonably knew when he or she acted, especially when the officer had to make a split-second decision in a "tense, uncertain, and rapidly evolving" situation.[45]  For example, if a police officer shot a suspect after the suspect brandished what looked like a gun, the officer's reasonable perception that the suspect was armed would entitle the officer to qualified immunity—even if the "gun" turned out to be a cell phone.[46]  But the timing factor also applies when later-discovered facts arguably justify an officer's actions even though the officer could not have known those facts when he or she acted.  For example, if a police officer shot a suspect before perceiving any threat, the officer would lack qualified immunity—even if the suspect actually had a gun nearby and likely would have harmed the officer.

---

[44] *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) (citation and internal quotation marks omitted).

[45] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted).

[46] *See Simmonds v. Genesee Cty.*, 682 F.3d 438, 442, 445 (6th Cir. 2012).

The Supreme Court recently reaffirmed this rule in *Hernandez v. Mesa*. There, a U.S. Border Patrol agent shot and killed 15-year-old Sergio Hernandez, a Mexican citizen, in a culvert between the United States and Mexico.[47] The Fifth Circuit had held that even if the shooting violated the Fifth Amendment, it was not clearly established that the Constitution applied to aliens abroad.[48] But the Supreme Court rejected that analysis, holding that because "Hernandez's nationality and the extent of his ties to the United States were unknown to [the agent] at the time of the shooting," those facts were irrelevant.[49]

J.A.'s citizenship and ties to the United States are similarly irrelevant here. When he shot J.A., Swartz could not have known whether the boy was an American citizen. Thus, Swartz is not entitled to qualified immunity on the bizarre ground that J.A. was not an American. For all Swartz knew, J.A. was an American citizen with family and activities on both sides of the border. Therefore, the question is not whether it was clearly established that aliens abroad have Fourth Amendment rights. Rather, it is whether it was clearly established that it was unconstitutional for an officer on American soil to use deadly force without justification against a person of unknown nationality on the other side of the border.

---

[47] 137 S. Ct. 2003, 2004–05 (2017) (per curiam).

[48] *Hernandez v. United States*, 785 F.3d 117, 120–21 (5th Cir. 2015) (en banc), *vacated and remanded sub nom. Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (per curiam).

[49] *Hernandez*, 137 S. Ct. at 2007.

Had there been a serious question about whether the Constitution banned federal officers from gratuitous cross-border killings, *Tennessee v. Garner*[50] and *Harris v. Roderick*[51] would have answered it. "It does not take a court ruling for an official to know that no concept of reasonableness could justify the unprovoked shooting of another person."[52]   Any reasonable officer would have known, even without a judicial decision to tell him so, that it was unlawful to kill someone—anyone—for no reason.  After all, *Tennessee v. Garner* held that an officer could not shoot a non-threatening, fleeing suspect.[53]   Would Swartz have us treat it as an open question whether an officer could kill a non-threatening person who was not a suspect and who was not fleeing?  Or, since the police officer in *Garner* shot the fleeing suspect with a gun, would it be an open question if an officer shot a fleeing suspect with a crossbow?   Any reasonable officer should know that the answer to both questions, despite the lack of a case on all fours.[54]

We explained in *Hardwick v. County of Orange* that "malicious criminal behavior is hardly conduct for which

---

[50] 471 U.S. 1, 11 (1985).

[51] 126 F.3d 1189, 1201 (9th Cir. 1997).

[52] *Hernandez v. United States*, 757 F.3d 249, 279 (5th Cir. 2014) (discussing the Fifth Amendment), *rev'd en banc*, 785 F.3d 117 (5th Cir. 2015).

[53] 471 U.S. at 3–4, 11.

[54] *See Hope v. Pelzer*, 536 U.S. 730, 738–39, 741 (2002); *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.).

qualified immunity is either justified or appropriate."**55** Qualified immunity "exists to protect mistaken but reasonable decisions, not purposeful criminal conduct."**56** Rodriguez's complaint makes a persuasive case for murder charges.**57** Indeed, the United States has indicted and tried Swartz for murder.**58** We are unable to imagine a serious argument that a federal agent might not have known that it was unlawful to shoot people in Mexico for no reason.

To be sure, *Brosseau v. Haugen* holds that the Fourth Amendment prohibition on excessive force is "cast at a high level of generality."**59** That general prohibition clearly establishes a constitutional violation only "in an obvious case."**60** But this is an obvious case. Unlike officers in other situations,**61** Swartz did not have to determine how much force to use; he was not permitted to use any force

---

**55** 844 F.3d 1112, 1119 (9th Cir. 2017).

**56** *Id.*

**57** *See* 18 U.S.C. § 1111(a); ARIZ. REV. STAT. § 13-1104.

**58** *See United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (permitting judicial notice of this fact). A jury acquitted Swartz of murder but hung on manslaughter. The United States has indicated that it will retry Swartz for manslaughter. *United States v. Swartz*, No. 4:15-cr-01723 (D. Ariz.), ECF Nos. 454, 498.

**59** 543 U.S. 194, 199 (2004) (per curiam).

**60** *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

**61** *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153–54 (2018) (per curiam); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305, 309–10 (2015) (per curiam).

whatsoever against someone who was innocently walking down a street in Mexico.

One final note.  The district court dismissed Rodriguez's Fifth Amendment claim because the Fourth Amendment applied, and we do not analyze the Fifth Amendment claim here.  But if the Fourth Amendment does not apply because J.A. was in Mexico, then the Fifth Amendment "shocks the conscience" test may still apply.[62]  Swartz's conduct would fail that test.  We cannot imagine anyone whose conscience would not be shocked by the cold-blooded murder of an innocent person walking down the street in Mexico or Canada by a U.S. Border Patrol agent on the American side of the border.

## II.  *BIVENS* CAUSE OF ACTION

Under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, courts may extend a cause of action for money damages for certain constitutional violations.[63]  We hold that based on the facts alleged in the complaint, Rodriguez is entitled to bring a "*Bivens* cause of action" against Swartz.

### A.  We may consider whether to extend *Bivens*.

Before we consider whether Rodriguez has a *Bivens* cause of action, however, we must address two preliminary issues: jurisdiction and waiver.  We previously held that on an

---

[62] *Compare Hernandez v. United States*, 785 F.3d 117, 135 (5th Cir. 2015) (Prado, J., concurring) *with id.* at 122–23 (Jones, J., concurring).

[63] 403 U.S. 388, 389 (1971).

interlocutory appeal of a denial of qualified immunity, we lacked appellate jurisdiction to decide whether there was a *Bivens* cause of action.**[64]** Moreover, Swartz did not challenge whether Rodriguez could sue under *Bivens* until he filed his reply brief on appeal. That would normally constitute a waiver even though the United States addressed the issue in its amicus brief.**[65]**

But there is new law to consider. In *Hernandez v. Mesa*, the Fifth Circuit confronted a cross-border shooting similar to the one here. It held that even if the shooting was unconstitutional, the law was not clearly established at the time.**[66]** It did not decide whether the family of the boy who was shot had a *Bivens* cause of action.**[67]** In fact, the officer who shot him had not moved to dismiss on that basis.**[68]** Yet the Supreme Court reversed, holding that whether *Bivens* applied was "'antecedent' to the other questions presented."**[69]** It then remanded the case so that the Fifth Circuit could

---

**[64]** *See, e.g.*, *Sissoko v. Rocha*, 440 F.3d 1145, 1154 (9th Cir. 2006), *reinstated in relevant part on denial of reh'g en banc*, 509 F.3d 947, 948 (9th Cir. 2007).

**[65]** *See United States v. Salman*, 792 F.3d 1087, 1090 (9th Cir. 2015); *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993).

**[66]** *See Hernandez v. United States*, 785 F.3d 117, 120–21 (5th Cir. 2015) (en banc), *vacated and remanded sub nom. Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (per curiam).

**[67]** *See id.* at 121 n.1 (Jones, J., concurring).

**[68]** *See Hernandez*, 137 S. Ct. at 2011 (Breyer, J., dissenting).

**[69]** *Id.* at 2006 (per curiam) (quoting *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014)).

consider whether the boy's family had a *Bivens* cause of action.[70]  In a different context, we have also held that qualified immunity "by necessity" implicates whether there is a *Bivens* cause of action.[71]  We therefore hold that we have jurisdiction to decide whether Rodriguez has a *Bivens* cause of action.[72]  Given the Supreme Court's instruction in *Hernandez*, we must now address that issue.

## B. *Bivens* **permits a cause of action for damages in certain cases.**

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics* held that a violation of the Fourth Amendment by federal agents acting under color of law gave rise to a cause of action for money damages.[73]  In that case, federal agents arrested Webster Bivens and searched his home.  But the agents did not have probable cause or a search warrant, so their search and seizure violated the Constitution. The Court held that Bivens was entitled to sue the agents for

---

[70] *See id.* at 2006–07.

[71] *Solida v. McKelvey*, 820 F.3d 1090, 1093 (9th Cir. 2016); *see Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007) (quoting *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006)) (stating that whether a cause of action exists is "directly implicated by the defense of qualified immunity and [is] properly before us on interlocutory appeal").

[72] Other circuits have reached the same conclusion.  *See Vanderklok v. United States*, 868 F.3d 189, 197 (3d Cir. 2017); *De La Paz v. Coy*, 786 F.3d 367, 371 (5th Cir. 2015); *Vance v. Rumsfeld*, 701 F.3d 193, 197–98 (7th Cir. 2012) (en banc); *Doe v. Rumsfeld*, 683 F.3d 390, 393 (D.C. Cir. 2012); *Koubriti v. Convertino*, 593 F.3d 459, 466 (6th Cir. 2010).

[73] 403 U.S. 388, 389 (1971).

damages.[74]  It explained that there were "no special factors counselling hesitation in the absence of affirmative action by Congress," in part because the agents themselves, not the government, would be liable for damages.[75]

Justice Harlan concurred in the judgment.  He agreed that the Court had the "judicial power to accord damages as an appropriate remedy in the absence of any express statutory authorization" by Congress.[76]  He then explained that damages were "the only possible remedy" for Bivens: an injunction could not prevent what had already happened, the United States was immune to suit, and the exclusionary rule would be irrelevant if Bivens had not committed any crimes.[77] So for Bivens, it was "damages or nothing."[78]

In *Davis v. Passman*, the Court extended *Bivens* to a case of employment discrimination in violation of the Fifth Amendment.[79]  A congressman had fired an administrative assistant because she was female; the congressman thought a male should hold the position.[80]  The Court held that the

---

[74] *Id.* at 389–90.

[75] *Id.* at 396.

[76] *Id.* at 402 n.4 (Harlan, J., concurring in the judgment) (discussing *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964)).

[77] *Id.* at 409–10.

[78] *Id.* at 410.

[79] 442 U.S. 228 (1979).

[80] *Id.* at 230.

wrongfully terminated woman could sue the congressman for damages.[81]   Citing Justice Harlan's concurring opinion in *Bivens*, the Court explained that for the woman, it was "damages or nothing."[82]   Moreover, no "special factors" barred her cause of action.   Although Congress had not passed a statute prohibiting sex discrimination against congressional employees, there was also no evidence that Congress intended to permit such discrimination.[83]   And though the Speech and Debate Clause of the Constitution confers special protections on members of Congress,[84] the Court reaffirmed that "all individuals, whatever their position in government, are subject to federal law."[85]   The Court therefore held that unless the congressman could somehow show that the Speech and Debate Clause protected his actions, the woman he had fired could sue him for damages.[86]

A year later, in *Carlson v. Green*, the Court extended *Bivens* to a claim that federal prison officials violated the

---

[81] *Id.* at 242, 244, 248.

[82] *Id.* at 245 (quoting *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 410 (1971) (Harlan, J., concurring in the judgment)).

[83] *Id.* at 247.

[84] *See* U.S. CONST. art. I, § 6, cl. 1 (providing that Senators and Representatives, "for any Speech or Debate in either House, . . . shall not be questioned in any other Place").

[85] *Davis*, 442 U.S. at 246 (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)).

[86] *Id.* at 246, 248; *see id.* at 235 n.11 (reserving the question of whether the Speech or Debate Clause protected the congressman's actions).

Eighth Amendment by not providing an inmate with proper medical care.[87]  The Court extended a *Bivens* cause of action because there were "no special factors counselling hesitation" and because no substitute remedies were available.[88]  In so holding, the Court explained that *Bivens* actions are a desirable deterrent against abusive federal employees.[89]

*Bivens*, *Davis*, and *Carlson* therefore establish that plaintiffs can sue for damages for certain constitutional violations.  But other cases demonstrate that a *Bivens* cause of action is not available for every constitutional violation. *Chappell v. Wallace*[90] and *United States v. Stanley*[91] hold that *Bivens* does not apply to injuries that arise out of military service.  Those two decisions emphasize Congress's unique power over the military.[92]  *Bush v. Lucas* holds that a public employee fired in violation of the First Amendment does not have a *Bivens* cause of action because Congress has already created a detailed system for resolving personnel disputes.[93] According to *Schweiker v. Chilicky*, there is no *Bivens* remedy for a procedural due process violation committed

---

[87] 446 U.S. 14, 16 & n.1 (1980).

[88] *Id.* at 18–19.

[89] *See id.* at 21–22.

[90] 462 U.S. 296, 304 (1983).

[91] 483 U.S. 669, 681–82, 684 (1987).

[92] *See Stanley*, 483 U.S. at 379–84; *Chappell*, 462 U.S. at 300–04.

[93] 462 U.S. 367, 388–90 (1983).

during a Social Security disability determination.[94]  That is because the Social Security Act already provides an elaborate scheme for resolving whether a person is entitled to Social Security benefits.[95]  *FDIC v. Meyer* holds that *Bivens* does not apply to suits against federal agencies,[96] and *Correctional Services Corp. v. Malesko* similarly holds that one cannot bring a *Bivens* action against a private corporation.[97]  In *Wilkie v. Robbins*, the Court held that *Bivens* did not extend to a case about a ranch owner who claimed that the government intimidated and harassed him.[98]  *Minneci v. Pollard* holds that *Bivens* does not extend to suits against private prison employees for Eighth Amendment violations.[99]  Unlike the government employees in *Carlson*, the private contractors in *Minneci* could be sued under state tort law.[100]  And in *Ziglar v. Abbasi*, the Court held that those detained on suspicion of terrorism after the September 11 attacks did not have a *Bivens* cause of action to challenge their detention.[101]

*Abbasi* demonstrates several principles that have emerged from this line of cases.  First, *Abbasi* makes plain that even

---

[94] 487 U.S. 412, 414 (1988).

[95] *Id.* at 425, 428–29.

[96] 510 U.S. 471, 484 (1994).

[97] 534 U.S. 61, 66, 74 (2001).

[98] 551 U.S. 537, 561–62 (2007).

[99] 565 U.S. 118, 125 (2012).

[100] *See id.* at 126–31.

[101] 137 S. Ct. 1843, 1863 (2017).

though a *Bivens* action lies for some constitutional violations (like the Fourth Amendment claim in *Bivens*), it does not lie for all violations (like the Fourth Amendment claim in *Abbasi*).[102]

Second, *Abbasi* explains that if a case presents a "new context" for a *Bivens* claim, then we must exercise "caution" in determining whether to extend *Bivens*.[103]  That is because "expanding the *Bivens* remedy is now a 'disfavored' judicial activity."[104]  And while *Abbasi* mandates caution and disfavor only when courts extend *Bivens* into a "new context," a case presents a new context whenever it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court."[105]

Third, if a case presents a new context for a *Bivens* claim, then we can extend it only if two conditions are met.  One condition is that the plaintiff must not have any other adequate alternative remedy.  The other condition is that there cannot be any "special factors" that lead us to believe that Congress, instead of the courts, should be the one to authorize a suit for money damages.[106]

---

[102] *See id.* at 1854, 1859, 1863.

[103] *Id.* at 1856.

[104] *Id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

[105] *Id.* at 1859; *see id.* at 1865 ("Given this Court's expressed caution about extending the *Bivens* remedy, . . . the new-context inquiry is easily satisfied.").

[106] *See id.* at 1857–58.

Together, these three principles restrict when we can extend a *Bivens* cause of action. But *Bivens* and its progeny are still good law. *Bivens*, *Davis*, and *Carlson* have never been overruled, implicitly or explicitly. Instead, *Abbasi* went out of its way to emphasize that the Court did "not intend[] to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose."[107] So at least in the "common and recurrent sphere of law enforcement," *Bivens* is "settled law."[108]

This brings us to a fourth principle of the Court's *Bivens* jurisprudence: in the right case, we may extend *Bivens* into a new context. After all, if *Bivens* could not be expanded so that it applied in a new context, there would be no need for "caution" or treating expansion as a "disfavored judicial activity," or considering whether there was an adequate alternative remedy or special factors. Determining that the context was new would be the end of the inquiry, not the beginning. If extension were prohibited, then *Abbasi* could simply have concluded that each of the claims presented a "new context" and ended its analysis there. But instead, *Abbasi* went on to explain why extension was inappropriate for certain claims.[109] And for the remaining claim, it remanded the case to let a lower court consider in the first instance whether to extend *Bivens*.[110] That instruction for a

---

[107] *Id.* at 1856.

[108] *Id.* at 1857.

[109] *Id.* at 1860–63.

[110] *Id.* at 1865 (plurality opinion).

lower court to consider extension would have been superfluous if courts were barred from extending *Bivens*.

We apply these four principles in this case. This case presents a new *Bivens* context. Like *Bivens*, this case is about a federal law enforcement officer who violated the Fourth Amendment. But this case differs from *Bivens* because J.A. was killed in Mexico (by a bullet fired in the United States) and because we are applying the Constitution to afford a remedy to an alien under these circumstances.[111] We therefore cannot extend *Bivens* unless: (1) Rodriguez has no other adequate alternative remedy; and (2) there are no special factors counseling hesitation. We now turn to those two inquiries, keeping in mind that extension is disfavored and that we must exercise caution.

### C. Rodriguez does not have an adequate alternative remedy.

We cannot grant a *Bivens* cause of action if "any alternative, existing process for protecting the [constitutional] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."[112] We also cannot extend *Bivens* if Congress's "failure to provide money damages, or other significant relief, has not been inadvertent."[113]

---

[111] *See Hernandez v. Mesa*, 885 F.3d 811, 816 (5th Cir. 2018) (en banc); *id.* at 824 (Prado, J., dissenting); *see also Hernandez v. Mesa*, 137 S. Ct. 2003, 2008 (2017) (Thomas, J., dissenting).

[112] *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

[113] *Berry v. Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (citation omitted).

Swartz and the United States have suggested several possible alternative remedies.  But even though an alternative remedy need not be "perfectly congruent" with *Bivens*[114] or "perfectly comprehensive,"[115] it still must be "adequate."[116]  None of the suggested alternatives is adequate.  We also do not think that Congress meant to bar a remedy.  Congressional legislation that does address *Bivens* (the Federal Tort Claims Act, as amended) signals at least acquiescence.  That other statutes were silent in unrelated circumstances is irrelevant: here, "[a]s is often the case, [C]ongressional silence whispers" only "sweet nothings."[117]

### 1. Rodriguez cannot bring a tort claim against the United States.

The United States has sovereign immunity, meaning it cannot be sued without its consent.  The Federal Tort Claims Act (FTCA) provides that consent for certain tort claims brought against the United States, including certain claims about abusive federal law enforcement officers.[118]  But the FTCA also specifically provides that the United States cannot

---

[114] *Minneci v. Pollard*, 565 U.S. 118, 129 (2012).

[115] *Adams v. Johnson*, 355 F.3d 1179, 1185 n.3 (9th Cir. 2004) (citation omitted).

[116] *See Minneci*, 565 U.S. at 120; *see also id.* at 130 ("roughly similar").

[117] *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 537 (5th Cir. 2006).

[118] *See* 28 U.S.C. §§ 2674, 2680(h).

be sued for claims "arising in a foreign country."[119]   This "foreign country exception" means that the United States is completely immune from "all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred."[120]   J.A. suffered his deadly injury in Mexico, so Rodriguez cannot sue the United States under the FTCA.[121]

But this foreign country exception does not imply, as Swartz, the United States, and the dissent all argue, that Congress intended to prevent Rodriguez from having a *Bivens* remedy.   This is because "the foreign country exception . . . codified Congress's 'unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power.'"[122]   At the time, standard choice-of-law analyses, which have not been uniformly abrogated, focused on the place the harm occurred, and would have compelled U.S. courts to apply foreign law, even to a state common law claim, leading "to a good deal of difficulty."[123]   Thus, "[t]he object being to avoid application of substantive foreign law, Congress evidently used the modifier 'arising in a foreign country' to refer to claims based on foreign harm or injury,

---

[119] 28 U.S.C. § 2680(k).

[120] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004).

[121] *See id.* at 697–99, 701–02, 712.

[122] *Id.* at 707 (quoting *United States v. Spelar*, 338 U.S. 217, 221 (1949)).

[123] *Id.* (quoting *Hearings on H.R. 5373 et al. Before the H. Comm. on the Judiciary*, 77th Cong., 2d Sess., 35 (1942) (statement of Assistant Att'y Gen. Francis Shea)).

the fact that would trigger application of foreign law to determine liability."[124]  And even under modern choice of law rules, the application of state tort law could mean the application of state choice of law rules, which, in turn, could lead to the application of foreign substantive law, which is what Congress did not want.[125]  Allowing a *Bivens* cause of action here, however, does not implicate this concern because it arises under only U.S. constitutional law and does not implicate Mexican substantive law or even Arizona choice-of-law provisions that could lead to the application of Mexican substantive law.  This is all that Congress sought to avoid.[126]

More significantly, an amendment to the FTCA called the Westfall Act shows that the FTCA is concerned only with common law actions.  Under the Westfall Act, if a federal agent commits a tort while acting within the scope of his or her employment, then any resulting civil suit must be brought against the United States under the FTCA.[127]  If the agent is sued individually, the United States is substituted as the defendant.[128]  The purpose of the amendment was to "protect Federal employees from personal liability for common law torts committed within the scope of their employment, while providing persons injured by the common law torts of Federal employees with an appropriate remedy against the United

---

[124] *Id.* at 707–08.

[125] *Id.* at 710.

[126] *Id.*

[127] 28 U.S.C. § 2679.

[128] *Id.* § 2679(b)(1), (d).

States."[129]   The Westfall Act is clear, however, that the protection afforded federal employees for common law torts "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States."[130]

In other words, the FTCA has an "explicit exception for *Bivens* claims," allowing them to proceed against individuals.[131] This ensures that federal officers cannot dodge liability for their own constitutional violations by foisting their liability onto the government. As a contemporaneous House Report explained, "[s]ince the Supreme Court's decision in *Bivens*, . . . the courts have identified [a constitutional] tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, [the Westfall Act] would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights."[132]   Indeed, in discussing the FTCA, the dissent "acknowledge[s] that in a proper context, as delineated by the Supreme Court in *Abbasi*, the *Bivens* remedy may well be available."[133]   We agree, and as we show, after *Abbasi*, the facts here do present a proper context. The Westfall Act also

---

[129] Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 2(b), 102 Stat. 4563, 4564.

[130] 28 U.S.C. § 2679(b)(2)(A).

[131] *Hui v. Castaneda*, 559 U.S. 799, 807 (2010).

[132] H.R. REP. NO. 100-700, at 6 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5950.

[133] Dissent at 65 n.3.

shows why the dissent is wrong to claim an incongruity between an alien's inability to sue the United States for injuries on Mexican soil under the FTCA and her ability to sue an individual for those same injuries under *Bivens*. That is exactly the structure the Westfall Act imposes.

### 2.  Rodriguez cannot bring a state law tort claim against Swartz.

The United States suggests that Rodriguez could sue Swartz for wrongful death under Arizona tort law. But its brief merely mentions the possibility, without fleshing it out with any citations to Arizona law. And it appears that the Westfall Act would bar such a claim. As just discussed, the Westfall Act in effect "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties."[134]

At this stage of litigation, we must assume that Swartz acted within the scope of his employment. The complaint alleges that J.A. was shot by an agent "stationed on the U.S. side of the fence" and that Swartz "acted under color of law." Swartz himself interprets the complaint as alleging that he was "on duty" when he shot J.A. He argued in district court that he had acted "within the course and scope of his employment." Under the applicable law, an employee "acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct

---

[134] *Osborn v. Haley*, 549 U.S. 225, 229 (2007).

subject to the employer's control."[135] If Swartz was "on duty" when he shot J.A., then it seems that he would have been acting within the scope of his employment even if he violated rules governing his conduct.[136] Thus, Rodriguez cannot bring a state-law tort action against Swartz without the Westfall Act converting it into an FTCA suit against the United States.[137] At that point, as discussed, the claim would be barred by the FTCA's foreign country exception because the injury occurred in Mexico. Although the application of Arizona law would not on its face qualify as the application of foreign law, the concern was that a state's choice of law rules as applied to common law torts *could* still require the application of foreign law.

### 3. Restitution is not an adequate alternative.

The United States indicted and tried Swartz for murdering J.A. Though a jury acquitted him of murder, the government has indicated that it will retry him for manslaughter. If he is convicted, federal law will require him to pay restitution to

---

[135] *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 602 n.1 (Ariz. 2012) (en banc) (citation omitted); *see Wilson v. Drake*, 87 F.3d 1073, 1076 (9th Cir. 1996) (applying the agency law of the state where the alleged tort occurred).

[136] *Cf. Arizona v. Schallock*, 941 P.2d 1275, 1282–84 (Ariz. 1997) (en banc).

[137] *See Minneci v. Pollard*, 565 U.S. 118, 126 (2012) ("Prisoners ordinarily *cannot* bring state-law tort actions against employees of the Federal Government.") (citing the Westfall Act).

J.A.'s estate.**138**  The United States argues that such restitution is an adequate remedy.

But restitution is not an adequate remedy for several reasons.  First, even if a federal agent commits a crime in the course of his employment, the government has discretion whether to charge him.  A criminal charge is the government's remedy, not the victim's.  Second, Swartz can be convicted of a crime only if his guilt is proven "beyond a reasonable doubt."  By contrast, a *Bivens* claim requires the jury to find only that it is "more likely than not" that Swartz used objectively unreasonable force.**139**  So even if Swartz is acquitted of all criminal charges, he could still be liable for money damages.**140**  Third, criminal charges were potentially available in *Bivens* itself, yet that availability did not bar a damages cause of action.**141**

### 4. Section 1983 does not preclude a *Bivens* remedy.

According to the United States and the dissent, 42 U.S.C. § 1983 implies the absence of a damages remedy here.  Under § 1983, a state or local official who violates the constitution may be sued for damages by "any citizen of the United States

---

**138** *See* 18 U.S.C. § 3663A(a)(1), (b)(2)–(4).

**139** *See Addington v. Texas*, 441 U.S. 418, 423–24 (1979).

**140** *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam).

**141** *See Bivens v. Six Unknown Named Agents*, 409 F.2d 718, 724–25 (2d Cir. 1969) (discussing 18 U.S.C. §§ 2234–36), *rev'd*, 403 U.S. 388 (1971).

or other person within the jurisdiction thereof."[142] Because J.A. was not an American citizen, and because he was not shot within the jurisdiction of the United States, Rodriguez could not sue a state or local police officer for this type of shooting. Thus, the argument goes, Rodriguez should not be allowed to sue Swartz under *Bivens*, either. The dissent claims that it is "bizarre" for federal officers to face liability when state officers would not.

We disagree. Nearly 150 years ago, in response to an urgent message from President Grant, Congress enacted what became § 1983[143] as part of legislation to ensure that state and local officials could not escape liability for constitutional violations, which were endemic in the recently defeated Confederate States.[144] Proponents "continually referred to the failure of the state courts to enforce federal law designed for the protection of the freedman, and saw § [1983] as remedying this situation by interposing the federal courts between the State and citizens of the United States."[145] It is inconceivable that, at the same time, Congress thought about (and deliberately excluded liability for) cross-border incidents involving federal officials.

---

[142] 42 U.S.C. § 1983.

[143] *See* The Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13, 13 (extending a cause of action to "any person within the jurisdiction of the United States").

[144] *See Mitchum v. Foster*, 407 U.S. 225, 240–42 (1972); *see also Hernandez v. Mesa*, 885 F.3d 811, 830 (5th Cir. 2018) (Prado, J., dissenting).

[145] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 725 (1989) (opinion of O'Connor, J.).

### 5. There is no evidence a Mexican court could grant a remedy.

Swartz argues that Rodriguez could seek a remedy in a Mexican court. But that argument appears to be a mere makeweight. Swartz does not cite any authority showing that a Mexican court could exercise jurisdiction over him or that Rodriguez would have a remedy under Mexican law.[146] Nor does he attempt to show how Rodriguez could execute on a judgment from a Mexican court without running afoul of the Westfall Act.

### 6. The remaining arguments also fail.

We can summarily dispose of the three remaining arguments for the availability of some other remedy. First, even though the Torture Victim Protection Act (an amendment to the Alien Tort Claims Act) does not apply to American officials,[147] that is because Congress was focused on allowing claims for violations of customary international law against foreign officials, not barring suits against American ones. The goal was the codification of a particular Second Circuit opinion construing the Alien Tort Claims Act to allow suit against foreign torturers; Congress was responding to an attack on that construction by an influential

---

[146] A brief that actually cites Mexican law argues that Border Patrol agents *cannot* be sued in Mexican courts in cases like this. *See* Brief of Mexican Jurists, Practitioners, and Scholars as *Amici Curiae* in Support of Petitioners, *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (No. 15-118), 2016 WL 7229146.

[147] Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note).

judge.[148] Domestic officials were not at issue. Second, there is a history of diplomacy when the military harms aliens abroad.[149] But this case is not about the military, and nothing in the record suggests that any diplomatic remedy for J.A.'s mother is available. And third, Congress does permit discretionary administrative payments for injuries suffered abroad if Drug Enforcement Administration, State Department, or military personnel cause those injuries.[150] But unlike the Border Patrol, those agencies routinely operate and maintain an extended presence abroad.[151] Congress thus granted those agencies, as aspects of the United States, the discretion to pay for foreign tort claims to promote international comity.[152] Under these statutes, such a

---

[148] *See* H.R. REP. NO. 102-367, at 3–4 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 84, 86 (discussing *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), and *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 798 (D.C. Cir. 1984) (Bork, J., concurring)).

[149] *See* William R. Mullins, *The International Responsibility of a State for Torts of its Military Forces*, 34 MIL. L. REV. 59, 61–65 (1966).

[150] 21 U.S.C. § 904; 22 U.S.C. § 2669-1; 10 U.S.C. §§ 2734(a), 2734a(a).

[151] *See, e.g.*, S. REP. NO. 96-173, at 36 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 2003, 2038–39 (stating the DEA "has a substantial foreign operation" and requested the ability to pay for torts its agents committed abroad).

[152] *See* 10 U.S.C. §§ 2734(a) (allowing payments "[t]o promote and to maintain friendly relations"), 2734a(a) (allowing payments under "international agreements"); 22 U.S.C. § 2669(b) (allowing payments "for the purpose of promoting and maintaining friendly relations with foreign countries"); S. REP. NO. 96-173, at 36 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 2003, 2039 (seeking an alternative to the choice between pulling an agent from a foreign country and the resulting "hostility and

discretionary payment to an alien is an effect, not the purpose. These payments do not say anything about a Congressional intent to preclude *Bivens* claims against individuals. If anything, these statutes mostly cross-reference the FTCA,[153] under which, after the Westfall Act, the availability of discretionary administrative payments and lawsuits against the United States does *not* bar action against individual officers when the claim is a constitutional tort.[154]

In short, for Rodriguez, it is damages under *Bivens* or nothing, and Congress did not intend to preclude *Bivens*.

### D.  No "special factors" are present in this case.

Though a *Bivens* action is Rodriguez's only available adequate remedy, we cannot extend *Bivens* if a "special factor" counsels hesitation.[155]  Because we must proceed with caution and are reluctant to extend *Bivens*, we have carefully weighed all the reasons Swartz and the United States have offered for denying a *Bivens* cause of action.  But this case does not present any such special factors.  We are "well suited . . . to consider and weigh the costs and benefits of

---

unfavorable publicity" there and leaving the agent to "the mercy of a foreign court").

[153] *See* 21 U.S.C. § 904 (allowing the Drug Enforcement Agency to pay in the manner authorized by the FTCA, 28 U.S.C. § 2672); 22 U.S.C. § 2669(f) (same for the State Department).

[154] *See* 28 U.S.C. § 2679(b) (referencing 28 U.S.C. §§ 1346(b) (suits against the United States) and 2672 (discretionary administrative payments)).

[155] *See Wilkie v. Robbins*, 551 U.S. 537, 554, 562 (2007).

allowing a damages action to proceed" in this cross-border-shooting case, and there are no "sound reasons to think that Congress might doubt the efficacy or necessity of a damages remedy."[156]

The special factors analysis is almost always performed at a high level of specificity, not at the abstract level.[157]  For example, *Ziglar v. Abbasi* looked at specific claims about detention policies in the aftermath of the September 11 attacks, not at seizures and prison policies generally.[158] *Wilkie v. Robbins* also focused on the concrete facts and circumstances of that case.[159]  Likewise here, we look for special factors in terms of the specific facts alleged in the complaint, not cross-border shootings generally.[160]  In so doing, it is essential to keep in mind that Rodriguez does not seek damages from the United States.  Neither does she seek an injunction or declaratory judgment that might affect future

---

[156] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017).

[157] *See* James E. Pfander & David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*, 98 GEO. L.J. 117, 126 (2009) (noting that "the Court now takes a case-by-case approach to the evaluation of the availability of a *Bivens* action for particular constitutional claims").

[158] *Id.* at 1860–63.

[159] 551 U.S. at 555–62.

[160] *United States v. Stanley* conducted its special factors analysis at a relatively high level of generality.  483 U.S. 669, 681 (1987).  But that was a case-specific decision, and the Court recognized that "varying levels of generality" are possible.  *Id.*  Here, policy and analytic judgments lead us to look for special factors at a low level of generality.  *Id.* at 861–62.

government actions. Instead, she brings only a claim for money damages against Swartz as an individual.

Of course, in many hypothetical situations, a cross-border shooting would not give rise to a *Bivens* action. And in some situations (*e.g.*, repelling an armed invasion or foiling violent smugglers), it would be frivolous to claim a *Bivens* remedy. But this case involves the unjustifiable and intentional killing of someone who was simply walking down a street in Mexico and who did not direct any activity toward the United States. Our discussion is limited to those facts.

### 1.  This case is not about policies or policymakers.

A *Bivens* claim is "not a proper vehicle for altering an entity's policy,"[161] and *Abbasi* holds that a special factor is present when a plaintiff challenges high-level executive branch policies.[162]    The plaintiffs in *Abbasi* sued policymakers, including the Attorney General and the FBI Director,[163] in order to challenge "major elements of the Government's whole response to the September 11 attacks" and any subsequent attacks that might have been planned.[164]

---

[161] *Abbasi*, 137 S. Ct. at 1860 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)) (internal quotation marks omitted).

[162] *See id.* at 1860–61.

[163] *Id.* at 1853.

[164] *Id.* at 1861.

But Rodriguez does not challenge any government policy whatsoever.[165]  And neither the United States nor Swartz argues that he followed government policy.  Instead, federal regulations expressly *prohibited* Swartz from using deadly force in the circumstances alleged.[166]  Rodriguez also sued a rank-and-file officer, not the head of the Border Patrol or any other policy-making official.  This case is therefore like the ones that *Abbasi* distinguished—those involving "standard law enforcement operations"[167] and "individual instances of . . . law enforcement overreach."[168]  The standards governing Swartz's conduct are the same here as they would be in any other excessive force case.  Thus, *Abbasi* implies that *Bivens* is available.

## 2. Extending *Bivens* does not implicate national security.

In *Abbasi*, there were national security concerns because plaintiffs challenged the government's response to September 11.  That was a special factor because determining how best to protect the United States is a job for Congress and the

---

[165] *Accord Hernandez v. Mesa*, 885 F.3d 811, 826 (5th Cir. 2018) (Prado, J., dissenting).

[166] *See* 8 C.F.R. § 287.8(a)(2)(ii) (2012) ("Deadly force may be used *only* when a designated immigration officer . . . has reasonable grounds to believe that such force is *necessary* to protect the . . . officer or other persons from the *imminent* danger of *death* or *serious* physical injury.") (emphasis added).

[167] *Abbasi*, 137 S. Ct. at 1861 (citation and internal quotation marks omitted).

[168] *Id.* at 1862.

President, not judges.[169]  At the same time, however, *Abbasi* warned that "national-security concerns must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins."[170]  "This danger of abuse," *Abbasi* continued, "is even more heightened given the difficulty of defining the security interest in domestic cases."[171]  Here, "national-security concerns" are indeed waved before us as such a "talisman."

We recognize that Border Patrol agents protect the United States from unlawful entries and terrorist threats.[172]  Those activities help guarantee our national security.  But no one suggests that national security involves shooting people who are just walking down a street in Mexico.[173]  Moreover, holding Swartz liable for this constitutional violation would not meaningfully deter Border Patrol agents from performing their duties.  The United States and Swartz have identified no duty that would have required Swartz to shoot J.A.  Border

---

[169] *Id.* at 1861; *see Dep't of Navy v. Egan*, 484 U.S. 518, 529–30 (1988).

[170] 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)) (internal quotation marks omitted).

[171] *Id.* (quoting *Mitchell*, 472 U.S. at 523) (internal quotation marks omitted).

[172] *See* 6 U.S.C. § 211(e)(3) (defining the duties of the U.S. Border Patrol).

[173] *Cf. Meshal v. Higgenbotham*, 804 F.3d 417, 419 (D.C. Cir. 2015) (detention abroad); *Vance v. Rumsfeld*, 701 F.3d 193, 196 (7th Cir. 2012) (en banc) (interrogation and detention abroad); *Lebron v. Rumsfeld*, 670 F.3d 540, 545 (4th Cir. 2012) (detention); *Arar v. Ashcroft*, 585 F.3d 559, 565–66 (2d Cir. 2009) (en banc) (rendition to foreign nation).

Patrol agents have faced Fourth Amendment *Bivens* claims in the past.[174] Agents sued under *Bivens* are liable only when they violate a "clearly established" constitutional right, and the rules governing the use of lethal force are clearly established.[175] It cannot harm national security to hold Swartz civilly liable any more than it would to hold him criminally liable, and the government is currently trying to do the latter. Thus, national security is not a special factor here.

### 3. Extending *Bivens* would not have problematic foreign policy implications.

The United States argues that we should not extend *Bivens* here because the cross-border nature of the shooting implicates foreign policy. The United States is correct that courts should not extend *Bivens* if it requires courts to judge American foreign policy.[176] But the United States has not explained how any policy is implicated or could be complicated by applying *Bivens* to this shooting. It has not identified any policy that might be undermined. Just as national security cannot be used as a talisman to ward off inconvenient claims, neither does the "mere incantation" of the magic words "foreign policy" cause a *Bivens* remedy to

---

[174] *E.g.*, *Chavez v. United States*, 683 F.3d 1102, 1106–07 (9th Cir. 2012); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006).

[175] The practical concerns raised in *Vanderklok v. United States*, 868 F.3d 189, 208–09 (3d Cir. 2017), do not exist here because Swartz was a trained law-enforcement officer. *See Hernandez v. Mesa*, 885 F.3d 811, 828–29 (5th Cir. 2018) (Prado, J., dissenting).

[176] *Cf. Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy . . . are rarely proper subjects for judicial intervention.").

disappear.[177]    In this case, extending *Bivens* would not implicate American foreign policy.  There is no American foreign policy embracing shootings like the one pleaded here. To the contrary: it would threaten international relations if we declined to extend a cause of action, because it would mean American courts could not give a remedy for a gross violation of Mexican sovereignty.

The United States says that this case implicates foreign policy because the American and Mexican governments have discussed "the use of force at the border"[178] and created a bilateral council to "address border violence, use of force, and ways to address and mitigate incidents of border violence."[179] It then says that if we extend *Bivens* here, it will "inject the courts into these sensitive matters of international diplomacy and risk undermining the government's ability to speak with one voice in international affairs."

But that argument proves too much.  It would have the courts decline to address any crimes involving our border with Mexico.  If the government's argument were correct,

---

[177] *Hernandez*, 885 F.3d at 830 (Prado, J., dissenting) (quoting *Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 474 (5th Cir. 2016) (Jones, J., dissenting)).

[178] Governments of Mexico and the United States of America, *Joint Statement on the U.S.-Mexico Bilateral High Level Dialogue on Human Rights*, (Oct. 27, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/10/263759.htm.

[179] Dep't Homeland Sec., *Written Testimony for a House Committee on Oversight and Government Reform Hearing* (Sept. 9, 2015), https://www.dhs.gov/news/2015/09/09/written-testimony-dhs-southern-border-and-approaches-campaign-joint-task-force-west.

then courts would be excluded from all "incidents of border violence." Yet district courts along the border address such incidents routinely, in smuggling cases particularly, concurrently with whatever diplomacy may also be addressing them.

We fail to see how extending *Bivens* here would actually implicate American foreign policy. No policy has been brought to our attention, and no policymaking individuals have been sued, unlike in *Abbasi*. Swartz did not act pursuant to government policy. He broke the rules that were in the Code of Federal Regulations.[180] And the only policy interest that the United States has put forward—maintaining dialogue with the Mexican government—shows that our government wants to *reduce* the number of cross-border shootings. To that end, the United States prosecuted Swartz for murder.

The only foreign policy concern that we can glean from the briefs is the need to avoid violating Mexican sovereignty. As Mexico says in its amicus brief, "giving Mexican nationals an effective remedy for harm caused by arbitrary and unlawful conduct directed across the border by U.S. Border Patrol agents would not conflict with Mexico's laws and customs and could not possibly damage relations between our two countries."

---

[180] *See* 8 C.F.R. § 287.8(a)(2)(ii) (2012) ("Deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary to protect the . . . officer or other persons from the imminent danger of death or serious physical injury.").

## 4. Any presumption against extraterritorial remedies is rebutted.

Finally, we do not dispute the dissent's suggestion that the presumption against the extraterritorial application of statutes suggests an analogous presumption against extraterritorial *Bivens* claims. But the dissent ignores that the presumption can be overcome when actions "touch and concern the territory of the United States . . . with sufficient force to displace the presumption."[181]  That is the case here. Swartz was an American agent acting within the scope of his employment.[182]  Swartz's bullets crossed the border, but he pulled the trigger here.[183]  We have a compelling interest in regulating our own government agents' conduct on our own soil.[184]  Presumably, that is why the United States was willing to apply its criminal law "extraterritorially" in charging Swartz with homicide, even while simultaneously arguing that the presumption against extraterritoriality precludes the *Bivens* claim here because the injury happened a few feet

---

[181] *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 124–25 (2013).

[182] *Cf. Jensen v. Arab Bank, PLC*, 138 S. Ct. 1386, 1406 (2018) (suit against a Jordanian bank); *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328–29 (2016) (judgment executed on assets owned by the Bank of Iran).

[183] *Cf. RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2098 (2016) (racketeering in Europe); *Kiobel*, 569 U.S. at 111–12 (human rights violations in Nigeria); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 251–52 (2010) (securities fraud by a company traded on the Australian Stock Exchange).

[184] *See* 1 RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. e, at 420 (Am. Law Inst. 1971) ("[W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance.").

onto the other side of the border. A damages remedy against an officer for unconstitutional misconduct strengthens the set of disincentives that deter it. And, as we have shown, no other special factors counsel against this extraterritorial application of *Bivens*.

## CONCLUSION

Under the particular set of facts alleged in this case, Swartz is not entitled to qualified immunity. The Fourth Amendment applies here. No reasonable officer could have thought that he could shoot J.A. dead if, as pleaded, J.A. was innocently walking down a street in Mexico. And despite our reluctance to extend *Bivens*, we do so here: no other adequate remedy is available, there is no reason to infer that Congress deliberately chose to withhold a remedy, and the asserted special factors either do not apply or counsel in favor of extending *Bivens*.

Of course, the facts as pleaded may turn out to be unsupported. When all of the facts have been exposed, the shooting may turn out to have been excusable or justified. There is and can be no general rule against the use of deadly force by Border Patrol agents. But in the procedural context of this case, we must take the facts as alleged in the complaint. Those allegations entitle J.A.'s mother to proceed with her case.

**AFFIRMED**.

# APPENDIX



(First Amended Complaint, Exhibit A)

M. SMITH, Circuit Judge, dissenting:

This case presents yet another "tragic cross-border incident in which a United States Border Patrol agent standing on United States soil shot and killed a Mexican national standing on Mexican soil." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2004 (2017) (per curiam). However, before we can appropriately address any of the other challenging issues presented by this case, we must first respond to a question recently posed by the Supreme Court: "When a party seeks to assert an implied cause of action under the Constitution itself, . . . separation-of-powers principles are or should be central to the analysis. The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)).

In this case, the obvious answer is Congress. We lack the authority to extend *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to the cross-border context presented in this case.[1] In holding to the contrary, the majority creates a circuit split, oversteps separation-of-powers principles, and disregards Supreme Court law. I therefore respectfully dissent.

## I.  Expansion of the *Bivens* Remedy Is Disfavored.

In recent years, the Supreme Court has hewed consistently to a path of restraint in creating implied causes

---

[1] In this dissent, I address only the "antecedent" *Bivens* question. *Hernandez*, 137 S. Ct. at 2006 (quoting *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014)). I do not consider the extraterritorial reach of the Fourth Amendment or Agent Swartz's qualified immunity defense.

of action. However, the prevailing legal landscape was markedly different at the time the Court decided *Bivens*. "In the mid-20th century, the Court followed a different approach to recognizing implied causes of action than it follows now." *Abbasi*, 137 S. Ct. at 1855. "During this '*ancien regime*,' the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Id.* (citation omitted) (first quoting *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001); then quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). "[A]s a routine matter with respect to statutes, the Court would imply causes of action not explicit in the statutory text itself." *Id.* That *ancien regime* gave rise to the Court's decision in *Bivens*, which created an implied cause of action to remedy a constitutional violation by federal officials. *Id.*

The Court's current approach is very different. Gone are the days of apparent judicial generosity in recognizing implied causes of action. Instead, the Court has "adopted a far more cautious course before finding implied causes of action." *Id.* Indeed, the Court "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), and has "consistently refused to extend *Bivens* to any new context or new category of defendants," *id.* (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). To this day, the Court has authorized only two extensions of the original *Bivens* case, the most recent of which occurred thirty-eight years ago. *See Carlson v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979)). All subsequent attempts to expand *Bivens* have failed. *See Abbasi*, 137 S. Ct. at 1857 (citing eight Supreme Court decisions).

This "notable change in the Court's approach to recognizing implied causes of action" is rooted in respect for the separation of powers between Congress and the judiciary. *Id.* "[I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Id.* at 1856. In determining whether our "traditional equitable powers suffice to give necessary constitutional protection," or whether a damages remedy is necessary, we must pause when implying a damages remedy implicates economic and governmental concerns. *Id.* These concerns include, among other factors, the substantial monetary cost of defending and indemnifying claims against federal officials, as well as the time and administrative costs incident to litigation. *Id.*

The Supreme Court's present approach to implied causes of action has wrought profound changes to the *Bivens* landscape. Indeed, the Court recently mused that "the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Id.* In line with its reluctance to imply causes of action, the Court reaffirmed the viability of *Bivens* claims only narrowly in *Abbasi*, articulating a restrictive take on both halves of the *Bivens* test—(1) whether the case presents a new context for a *Bivens* remedy, and (2) whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18). First, with respect to the new-context inquiry, the Court voiced misgivings about extending *Bivens* to new contexts beyond the narrow "context in which it arose." *Id.* at 1856. Second, with respect to the special-factors inquiry, the Court observed that the decision to provide for a damages remedy should

"most often" be left to Congress, particularly in cases where numerous policy considerations must be weighed. *Id.* at 1857. Thus, the Court has left little room, if any, for lower courts to extend *Bivens* further.[2]

## II. *Hernandez* Is Instructive.

Our sister circuit's recent en banc decision in *Hernandez v. Mesa* illustrates the proper application of these principles. The facts of *Hernandez* are nearly identical to the ones in this case. Agent Mesa, standing on United States soil, fatally shot Sergio Hernandez, a fifteen-year-old Mexican citizen, on Mexican soil. 885 F.3d 811, 814 (5th Cir. 2018) (en banc). Hernandez's parents sued Agent Mesa for damages under *Bivens*, alleging that Agent Mesa violated Hernandez's rights under the Fourth and Fifth Amendments. *Hernandez*, 137 S. Ct. at 2005.

---

[2] The Supreme Court has further articulated these limiting principles. We must exercise "'caution' before 'extending *Bivens* remedies into any new context,'" and abide by the rule that "a *Bivens* remedy will not be available" in the presence of special factors. *Abbasi*, 137 S. Ct. at 1857 (quoting *Malesko*, 534 U.S. at 74). In conducting our analysis, we must be mindful of the Supreme Court's "general reluctance to extend judicially created private rights of action." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018). The Court has "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) (first citing *Malesko*, 534 U.S. at 68; then citing *Alexander*, 532 U.S. at 286–87). "The Court's recent precedents cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law," *Jesner*, 138 S. Ct. at 1402, to say no less of extending a judicially created private right of action extraterritorially. Put simply, decisions to expand or create causes of action are best tasked to "those who write the laws," not "those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (quoting *Bush*, 462 U.S. at 380).

The district court granted Agent Mesa's motion to dismiss. *Id.* A panel of the Fifth Circuit affirmed in part and reversed in part, finding that Hernandez lacked Fourth Amendment rights, but that the shooting, as alleged, had violated Hernandez's Fifth Amendment rights. *Id.* (citing *Hernandez v. United States*, 757 F.3d 249, 267, 272 (5th Cir. 2014), *aff'd in part*, 785 F.3d 117 (5th Cir. 2015) (en banc) (per curiam), *vacated and remanded sub nom. Hernandez v. Mesa*, 137 S. Ct. 2003 (2017)). The panel concluded that there was "no reason to hesitate in extending *Bivens* to this new context," and that Agent Mesa was not entitled to qualified immunity. *Id.* at 2005–06 (citing *Hernandez*, 757 F.3d at 275, 279).

The Fifth Circuit reheard the case en banc. The en banc court unanimously affirmed the district court's dismissal of the plaintiffs' claims. *Id.* at 2006. The en banc court held that the Fourth Amendment did not apply extraterritorially to Hernandez, and that Agent Mesa was entitled to qualified immunity on the Fifth Amendment claim. *Id.* (citing *Hernandez*, 785 F.3d at 119–20). Having resolved the claims on these grounds, the en banc court "did not consider whether, even if a constitutional claim had been stated, a tort remedy should be crafted under *Bivens*." *Id.* (quoting *Hernandez*, 757 F.3d at 121 n.1 (Jones, J., concurring)).

The Supreme Court granted certiorari. *Id.* Prior to deciding *Hernandez*, the Court decided *Abbasi*. *Id.* Although the availability of a *Bivens* remedy was not a question on appeal in *Hernandez*, the Supreme Court ordered supplemental briefing on that question. *See Hernandez v. Mesa*, 137 S. Ct. 291 (2016).

The Court subsequently vacated the judgment of the Fifth Circuit and instructed the court to consider, on remand, the availability of a *Bivens* remedy for the plaintiffs' Fourth and Fifth Amendment claims, in light of "the intervening guidance provided in *Abbasi*." *Hernandez*, 137 S. Ct. at 2006–07. The Court observed that the *Bivens* question, which was "antecedent" to the other questions in the case, might prove to be dispositive, and render unnecessary the resolution of the difficult Fourth and Fifth Amendment issues presented in the case. *Id.* at 2006–07 (quoting *Wood*, 134 S. Ct. at 2066).

On remand, the Fifth Circuit, sitting en banc, held that "[t]he transnational aspect of the facts present[ed] a 'new context' under *Bivens*, and numerous 'special factors' counsel[ed] against federal courts' interference with the Executive and Legislative branches of the federal government." *Hernandez*, 885 F.3d at 814. The en banc court concluded that "extending *Bivens* would interfere with the political branches' oversight of national security and foreign affairs"; "would flout Congress's consistent and explicit refusals to provide damage remedies for aliens injured abroad"; and "would create a remedy with uncertain limits." *Id.* at 823. Mindful that "[i]n its remand of *Hernandez*, the Supreme Court [had] chastened [the Fifth Circuit] for ruling on the extraterritorial application of the Fourth Amendment"—a "sensitive" issue with the potential to spawn "consequences that are far reaching"—the en banc court concluded that "[s]imilar 'consequences' [were] dispositive of the 'special factors' inquiry," and that "[t]he myriad implications of an extraterritorial *Bivens* remedy require[d] th[e] court to deny it." *Id.* (quoting *Hernandez*, 137 S. Ct. at 2007).

*Hernandez*'s lengthy path through the federal court system underscores several points. First, the availability of a *Bivens* remedy is a critical threshold question. Second, *Abbasi* did not merely recapitulate the Supreme Court's past law on *Bivens*—the Court characterized *Abbasi* as "intervening guidance." *Hernandez*, 137 S. Ct. at 2007. Third, a principled application of *Abbasi* to the facts of this case can yield only one answer: We lack the authority to extend a *Bivens* remedy to the cross-border shooting context.

Unlike the Fifth Circuit, which faithfully followed the Supreme Court's guidance, the majority fails to acknowledge the underlying principles of *Abbasi*, choosing instead to distinguish *Abbasi* on narrow factual grounds. The majority authorizes an impermissible extension of *Bivens* to a new context despite the presence of numerous special factors counselling judicial hesitation. In doing so, the majority creates a circuit split and tees up our court for a new "chastening" by the Supreme Court.

## III.    This Case Presents a New Context for a *Bivens* Claim.

The majority acknowledges, as it must, that this case presents a new *Bivens* context. However, the majority downplays the new-context inquiry, relegating its analysis on the question to only a few sentences. To properly address the majority's error, we first consider the Supreme Court's new instructions on the issue.

"The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by th[e] Court, then the context is new." *Abbasi*, 137 S. Ct. at

1859. That the differences between a given claim and previous *Bivens* cases are "small" is insignificant: "Given th[e] Court's expressed caution about extending the *Bivens* remedy, . . . the new-context inquiry is easily satisfied." *Id.* at 1865.

The Court provided a non-exhaustive list of differences that may render a given context new. *Id.* at 1859–60. For example,

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. At bottom, the touchstone is whether the "claims bear . . . resemblance to the three *Bivens* claims the Court has approved in the past," namely, "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id.* at 1860.

Rodriguez's claims bear no resemblance whatsoever to the three *Bivens* claims previously authorized by the Court.

The differences are obvious:  J.A. was a Mexican national, and his death, caused by the actions of a Border Patrol agent, occurred in Mexico.  This case presents far more than "a modest extension" of the Supreme Court's *Bivens* cases.  *Id.* at 1864.  Indeed, "no court has previously extended *Bivens* to cases involving either the extraterritorial application of constitutional protections or in the national security domain, let alone a case implicating both."  *Meshal v. Higgenbotham*, 804 F.3d 417, 424–25 (D.C. Cir. 2015), *cert. denied*, 137 S. Ct. 2325 (2017).  The Court also has never upheld a *Bivens* claim against Border Patrol agents, who perform different duties than FBI agents, Congressmen, or prison officials.  Under the Supreme Court's new-inquiry test, which is "easily satisfied," *Abbasi*, 137 S. Ct. at 1859, the majority's attempt to liken this case to *Bivens* is unpersuasive.

The majority fails to accord any meaningful significance to the conclusion that this case presents a new context for a *Bivens* claim.  By the majority's reckoning, the fact that a *Bivens* claim presents a new context means only that a court must perform the second half of the *Bivens* analysis—the special-factors inquiry—and nothing more.  This approach clearly flouts the Supreme Court's instructions.  The majority fails to heed the Supreme Court's warning that expanding *Bivens* is a "disfavored" activity, *id.* at 1857 (quoting *Iqbal*, 556 U.S. at 675), and that courts may not run roughshod across the separation of powers.  As was the case in *Hernandez*, Rodriguez's "unprecedented claims embody . . . a virtual repudiation of the Court's holding" in *Abbasi*. 885 F.3d at 818.  In fact, "[t]he newness of this 'new context' should alone require dismissal of [Rodriguez's] damage claims."  *Id.*

**IV.    Numerous Special Factors Counsel Against Authorizing a *Bivens* Remedy in This Case.**

Lest any doubt remain regarding our lack of authority to extend *Bivens* to the new context found in this case, I next consider the multiple special factors that also bar our conjuring a *Bivens* remedy in this case.

"A *Bivens* remedy is not available . . . where there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Hernandez*, 137 S. Ct. at 2006 (quoting *Carlson*, 446 U.S. at 18). While the Supreme Court "has not defined the phrase 'special factors counselling hesitation,'" it has explained that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857–58. "[T]o be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858. "In sum, if there are sound reasons to think Congress *might* doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong," we "*must* refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.* (emphases added). Relatedly, "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

This case is brimming with "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy." *Id.* First, cross-border violence implicates foreign

relations, an area uniquely unsuitable for judicial interference. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). Rather, "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018). The majority suggests that failure to imply a *Bivens* remedy in this case would "threaten international relations" and impair our relationship with Mexico, but the reality is that the judiciary is wholly ill-equipped to broker relations between two sovereign nations.

Indeed, the political branches have already undertaken several initiatives to resolve cross-border concerns. For example, the governments of the United States and Mexico established the joint Border Violence Prevention Council, a standing forum to address border violence issues. *See Hernandez*, 885 F.3d at 820 (citing DHS, *Written Testimony for a H. Comm. on Oversight & Gov't Reform Hearing* (Sept. 9, 2015), https://www.dhs.gov/news/2015/09/09/written-testimony-dhs-southern-border-and-approaches-campaign-joint-task-force-west). Moreover, the fatal cross-border shooting incident in *Hernandez* led to a "serious dialogue between the two sovereigns, with the United States refusing Mexico's request to extradite [Agent] Mesa but resolving to 'work with the Mexican government within existing mechanisms and agreements to prevent future incidents.'" *Id.* (quoting DOJ, *Federal Officials Close Investigation into the Death of Sergio Hernandez-Guereca* (Apr. 27, 2012), https://www.justice.gov/opa/pr/federal-officials-close-investigationdeath-sergio-hernandez-guereca). That the two sovereigns are working to address cross-border violence counsels hesitation against judicial interference in this area.

After all, "matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Haig*, 453 U.S. at 292 (alteration in original) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)).

Second, border security is not the prerogative of the judiciary, but of the political branches. *See Abbasi*, 137 S. Ct. at 1861; *see also United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States . . . ."). "The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence," *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012), and it is unlikely that the Supreme Court would entertain such an expansion of *Bivens* after *Abbasi*. Following suit, our sister circuits have rejected *Bivens* claims in the border-security context. *See Hernandez*, 885 F.3d at 818–19; *Vanderklok v. United States*, 868 F.3d 189, 207–09 (3d Cir. 2017) (concluding that special factors weighed against implying a *Bivens* action for damages against a TSA agent, because the TSA is "tasked with assisting in a critical aspect of national security—securing our nation's airports and air traffic," and because "[t]he threat of damages liability could . . . increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers").

The majority's effort to analogize this case to "standard law enforcement operations" does not withstand scrutiny. Although Border Patrol agents may perform some actions that are "analogous to domestic law enforcement" activities, *Hernandez*, 885 F.3d at 819, Border Patrol agents are tasked

with carrying out fundamentally different policies than domestic law enforcement officers. "Congress has expressly charged the Border Patrol with 'deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband.'" *Id.* (alterations in original) (quoting 6 U.S.C. § 211(e)(3)(B)).

Third, "Congress' failure to provide a damages remedy" in the context of cross-border violence cannot be ascribed to "mere oversight" or "inadverten[ce]." *Abbasi*, 137 S. Ct. at 1862 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)). "[I]n any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant." *Id.* Here, as in *Abbasi*, "that silence is telling." *Id.* The majority's decision to authorize an implied damages remedy in this case is precisely the sort of "'congressionally uninvited intrusion' [that] is 'inappropriate' action for the Judiciary to take." *Id.* (quoting *United States v. Stanley*, 483 U.S. 669, 683 (1987)).

What Congress has done in other instances is instructive. In *Abbasi*, the Supreme Court observed that "[i]n an analogous context," Congress assumedly weighed "a number of economic and governmental concerns" when it enacted the Federal Tort Claims Act (FTCA) and "decid[ed] not to substitute the Government as defendant in suits seeking damages for constitutional violations." *Id.* at 1856 (citing 28 U.S.C. § 2679(b)(2)(A)).[3] Congress did not stop there. It

---

[3] The majority cites 28 U.S.C. § 2679(b)(2) for the proposition that the FTCA allows an exception for *Bivens* claims. I acknowledge that in a proper context, as delineated by the Supreme Court in *Abbasi*, the *Bivens* remedy may well be available. Where the majority goes astray, however, is ignoring the import of § 2679(b)(2) with respect to the special-factors

also expressly excluded "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). In fact, "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, *regardless of where the tortious act or omission occurred*." *Sosa*, 542 U.S. at 712 (emphasis added). Thus, the majority's decision produces an incongruous result. On one hand, an alien injured on Mexican soil by cross-border tortious conduct may not bring a claim for damages under the FTCA. On the other hand, an alien injured on Mexican soil by cross-border unconstitutional conduct may bring an implied claim for damages under *Bivens*.

In a similar vein, "[t]he Torture Victim Protection Act provides a cause of action only against foreign officials, not U.S. officials." *Meshal*, 804 F.3d at 420; *see* 28 U.S.C. § 1350. And where Congress has enacted a remedial scheme for aliens injured abroad by certain United States employees, Congress has authorized administrative—but not judicial—remedies. *E.g.*, 10 U.S.C. §§ 2734(a), 2734a(a) (property loss, personal injury, or death incident to noncombat activities of armed forces); 21 U.S.C. § 904 (tort claims arising in foreign countries in connection with Drug Enforcement Administration operations abroad); 22 U.S.C. § 2669-1 (tort claims arising in connection with overseas State Department operations)). Congress has not authorized a comparable remedy for aliens injured abroad by Border Patrol agents.

---

inquiry. As the Court observed in *Abbasi*, the fact that Congress enacted § 2679(b)(2) signals that Congress, rather than the judiciary, is in the best position to "weigh[]" various "economic and governmental concerns," and to carry out the "substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." 137 S. Ct. at 1856 (citing § 2679(b)(2)(A)).

I note also that the right to sue under 42 U.S.C. § 1983 is available only to "any citizen of the United States or other person within the jurisdiction thereof." 42 U.S.C. § 1983. This express limitation strongly suggests that Congress did not intend to create a damages remedy for aliens injured abroad as the result of *federal* officials' unconstitutional conduct—assuming *arguendo* that the relevant constitutional provisions apply extraterritorially.[4] To infer otherwise, as the majority does, produces a bizarre result. A federal official who commits a cross-border violation of an alien's constitutional rights must stand suit for damages—without any congressional authorization, no less. However, a state official who commits the same cross-border violation is statutorily exempt from a suit for damages.

Congress has not only hesitated, but has declined, to allow aliens injured abroad to sue federal officials for damages. Congress, not the judiciary, is best positioned "to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857–58. Congress's silence in the area of cross-border violence is telling, and is yet another special factor counselling hesitation in this case.

Fourth, the cross-border nature of this case raises a "critical" special factor—extraterritoriality. *Meshal*, 804 F.3d at 425–26. It is unprecedented for *Bivens* to apply to aliens

---

[4] The majority thinks it "inconceivable" that Congress contemplated cross-border incidents involving federal officials when it enacted § 1983. The majority misses the point. The fact that Congress limited the pool of § 1983 plaintiffs to "any citizen of the United States or other person within the jurisdiction thereof," shows that it is the role of Congress, not the judiciary, to determine, in the first instance, who may sue for damages.

injured abroad. The very "novelty and uncertain scope of an extraterritorial *Bivens* remedy counsel[s] hesitation." *Hernandez*, 885 F.3d at 822; *see Alvarez v. U.S. Immigration & Customs Enf't*, 818 F.3d 1194, 1210 (11th Cir. 2016) (concluding that a claim that "would be doctrinally novel and difficult to administer" is a special factor), *cert. denied sub nom. Alvarez v. Skinner*, 137 S. Ct. 2321 (2017). "After all, the presumption against extraterritoriality is a settled principle that the Supreme Court applies even in considering *statutory* remedies." *Meshal*, 804 F.3d at 425 (emphasis added) (first citing *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013); then citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). How much more should we hesitate before implying a damages remedy extraterritorially by judicial mandate, in the absence of congressional action? "It would be grossly anomalous . . . to apply *Bivens* extraterritorially when we would not apply an identical statutory cause of action for constitutional torts extraterritorially." *Id.* at 430 (Kavanaugh, J., concurring). The majority's opinion creates exactly such a "grossly anomalous" result.

Finally, the majority places undue weight on what is, in its view, an insufficient alternative remedial structure. The majority's position finds no support in Supreme Court law. "[T]he *absence* of a remedy is only significant because the *presence* of one precludes a *Bivens* extension." *Hernandez*, 885 F.3d at 821. The *Bivens* remedy is not a freewheeling one—the lack of an alternative remedial structure cannot, on its own, compel judicial creation of a damages remedy.

The Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court."

*Malesko*, 534 U.S. at 69.  In fact, "[i]t d[oes] not matter . . . that '[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed.'"  *Id.* (fourth alteration in original) (quoting *Schweiker*, 487 U.S. at 425).  We may not use *Bivens* as a stop-gap wherever Congress has not created a remedial scheme:  Even if Rodriguez has no alternative remedy, that alone is not dispositive, "because, 'even in the absence of an alternative, a *Bivens* remedy is a subject of judgment[.]'" *Vanderklok*, 868 F.3d at 205 (alteration in original) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)); *see Meshal*, 804 F.3d at 425 (holding that no *Bivens* remedy was available, even in the absence of an alternative remedy for the plaintiff).  And, as previously discussed, Congress has declined to adopt a statutory remedial structure.

As previously noted, separations-of-powers principles underlie this point.  Even "if equitable remedies prove insufficient," and if "a damages remedy might be necessary to redress past harm and deter future violations," still, "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858.  Such concerns are considerable and wide-ranging.  They include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." *Id.*  "These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case." *Id.*

It is true, as the majority observes, that *Bivens* serves, in part, to deter individual officers. *Id.* at 1860. However, "the absence of a federal remedy does not mean the absence of deterrence" because "criminal investigations and prosecutions are already a deterrent." *Hernandez*, 885 F.3d at 821. As is evident from the Department of Justice's ongoing criminal prosecution of Agent Swartz, "[t]he threat of criminal prosecution for abusive conduct is not hollow." *Id.* In any event, "*Abbasi* makes clear that, when there is 'a balance to be struck' between countervailing policy considerations like deterrence and national security, '[t]he proper balance is one for the Congress, not the Judiciary, to undertake.'" *Id.* (alteration in original) (quoting *Abbasi*, 137 S. Ct. at 1863). Applying that instruction to this case, how best to deter any future abusive conduct by Border Patrol agents is not our determination to make.

Contrary to the majority, I conclude that several special factors prevent us from implying a damages remedy in this case. The special factors in this case are weighty, and counsel strongly against judicial interference "in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18).

## V.  Conclusion

In dissenting today, I am fully mindful of the tragedy underlying this case. I am also aware of the Supreme Court's warning that "[t]here are limitations . . . on the power of the Executive under Article II of the Constitution and in the powers authorized by congressional enactments," and that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Id.* at 1861–62 (quoting *Mitchell v.*

*Forsyth*, 472 U.S. 511, 523 (1985)).  Rather, heeding the Court's guidance in *Abbasi*, I have undertaken my analysis with one controlling question in mind:  "'[W]ho should decide' whether to provide for a damages remedy, Congress or the courts?"  *Id.* at 1857 (quoting *Bush*, 462 U.S. at 380).  Here, the task of deciding whether to create a damages remedy for Rodriguez lies squarely within the purview of Congress, not of the judiciary.

By creating an extraterritorial *Bivens* remedy in this case, the majority veers into uncharted territory, ignores Supreme Court law, and upsets the separation of powers between the judiciary and the political branches of government.  The majority pays only lip service to the new-context inquiry, without any real regard for the principles set forth in *Abbasi*, and concludes, remarkably, that there are no special factors weighing against this unprecedented expansion of *Bivens*.  The Supreme Court has made clear its views on expanding *Bivens*, and the majority has, in turn, made clear how it views the Court's instructions.  Instead of following suit, the majority turns back to the *ancien regime* now repudiated by the Court.

Three circuit courts touch the border between the United States and Mexico—our court, the Fifth Circuit, and the Tenth Circuit.  Today, two of the three are split.  The implications are troubling.  Whereas an alien injured on Mexican soil by a Border Patrol agent shooting from Texas lacks recourse under *Bivens*, an alien injured on Mexican soil by an agent shooting from California or Arizona may sue for damages.  This is an untenable result, and will lead to an uneven administration of the rule of law.

Applying Supreme Court law, I would adopt the reasoning of the Fifth Circuit. This case presents a new *Bivens* context, and numerous special factors counsel against judicial creation of an implied damages remedy in the cross-border context.

I respectfully dissent.